Okay, we'll call the next case for the day. Autumn Brown v. Liberty Mutual Group, Inc. You're first for Mr. Wiley. Good afternoon, Your Honors. The police of the court, Kevin Wiley, Jr. on behalf of the appellate Autumn K. Brown. Your Honor, this is an employment discrimination case. The facts are as follows. Ms. Brown began her employment with Liberty Mutual, the appellee, back in 2004. Over the six years from 2004, she attained the position of lead sales representative. She was top-notch, one of the leading persons in her field, attaining accreditations, attaining awards in her field, and ultimately attaining the title of being one of the most preeminent lead sales reps in the country. Now, in 2010, Ms. Brown became pregnant. And at that time, her supervisor, Lynn Peters, was basically the person that she reported to, basically the person in her industry that does all the compliance measures for the lead sales reps. Ms. Brown, for the first few months she was known to be pregnant, had a little bit of trepidation with regards to telling her supervisor that she was pregnant. And lo and behold, by the time that she did tell Ms. Peters that she was pregnant, beginning January of 2011, Ms. Peters did not say congratulations. She did not say, oh, well done, let's celebrate. No, Ms. Peters' initial reaction was, can you do your job? Can you do your job? Well, what followed in January of 2011 was a continuing action by Ms. Peters to bring Ms. Brown under complete scrutiny for her job performance. The way sales works in the insurance business, the way it worked for Ms. Brown, typically the sales of the insurance policies would ratchet up at the end of the year. January was not a time where sales would be in high number. However, Ms. Peters initiated this close scrutiny on a weekly basis, based upon these January low sales numbers. By February of 2011, go ahead. But wasn't there an allegation or a complaint that her sales were down? Were her sales down? The sales were down, Judge, because the sales were down because it was January. This wasn't the middle of the year. This wasn't the third quarter of the year. Sales are routinely down at the beginning of the year. Ms. Peters knew this. Ms. Brown knew this. But Ms. Peters insisted on having weekly, if not daily meetings, to scrutinize these numbers in the beginning of the year. So it wasn't sales from compared to last January or compared to last year? Immediate sales. So generally, immediate sales were down in January? Correct. But leading up to that year, Ms. Brown was one of the highest sales persons in her field. So by the time we get to February. Does the record reflect that Peters targeted Brown only for reduced January sales? As far as the scrutiny, as far as meetings, I believe the record does reflect that in comparison to other sales reps, Ms. Peterson was the ‑‑ I'm sorry, Lynn Peters was bringing Ms. Brown under this close watch, under this close scrutiny, whereas she was not treating the other sales reps in the same capacity. These were, like I said, daily meetings, weekly meetings, which to Ms. Brown's contention brought along much anxiety. And so I know my time is short and I want to get to the point as to the legal ramifications of these meetings. But ultimately, Your Honors, in February 14th of 2011, Ms. Brown was informed to come to Ms. Peters' office because we have just a regular meeting regarding sales. Now, over the month prior to this February 14th meeting, once again, we have close scrutiny, criticism, threats of taking resources away, threats of termination, and basically pushing Ms. Brown to increase those numbers. Pushing, pushing, pushing. Just in the first few weeks of the year. February 14th. Building to a tough environment, but so far no discipline, no pay reduction. So connected to some case law, is there an adverse employment action taken? And that's where we're going to get to, Judge, because in February 14th of this year, of that year, there was a complete surprise attack on Ms. Brown. She was forced to come to a meeting which indelibly was an audit of her performance, not a routine sales meeting. And that audit, in and of itself, caused so much anxiety. And what we're doing, Judge, is leading up to this meeting, there was so much anxiety on this pregnant lady. Three months into her pregnancy, she had to resign. She was forced to resign because of the actions of Ms. Peters. Because of- You said initially, when she told them that she was pregnant, that she was asked how will this affect her job. Throughout this time that you said she was under pressure to increase sales, was there anything else repeated about her pregnancy? Not in the record, Judge. However, Ms. Brown did, I believe, feel the anxiety after each and every meeting. So there wasn't a statement specifically that I'm putting you through this because you are pregnant. But compared to the other sales reps who were not having to go through these meetings, who were being treated differently at the same time, Ms. Brown can only come to one conclusion. It's because, well, you first of all questioned whether I can do the job because I'm pregnant. And now you're taking me through this process of scrutinizing me when you don't need to scrutinize me. After the audit traumatized her, wasn't she able to come back and answer the questions? And there was no- her numbers weren't bad. There was no problem? Barely. Barely. She was able to come back the next day and answer questions, but she was still traumatized. The trauma caused her to be hospitalized and indelibly- So your position is then a reasonable person with that amount of berating would have felt compelled to resign? What's the best case that you've got that gets sort of verbal reprimands to an intolerable level? Well, I won't tell the court that mathematically we can't look at things in- where there has to be some sort of subjective analysis. This has to be an objective analysis, but it has to be, as you say, Judge, a reasonable analysis. The best case that we can come up with is Donaldson v. CDB, Inc., which describes that when it comes to issues of humiliation, when it comes to issues of whether or not an employee under an objective standard is compelled to resign, the standards are such that a reasonable and objective person would resign because they can no longer tolerate the toxic environment that they're in. And that, we believe, is analogous to Ms. Brown's case where, no, we don't have issues of name-calling. We don't have issues of- Yes, sir. Mr. Wiley. Pardon? I'm sorry, Judge, what was your question? Her supervisor, Ms. Peters? Yes, sir. Did she tell Ms. Brown that she was the first employee she had ever had who was pregnant? Yes, Judge, there was- Does that figure into your argument in any way? It slightly figures into it, Judge, in that it's evidence upon evidence that Ms. Peters had an ultimate goal of having Ms. Brown either resign or take FMLA, which is another aspect of our case. Over the course of this process, when Ms. Brown was feeling this anxiety that Ms. Peter was putting her under, Ms. Peters told her, no, why don't you take FMLA? Just leave, okay? Part of our argument, Judge, is that by forcing this FMLA upon Ms. Brown, she essentially was trying to get Ms. Brown out of her pool of reps that would not count against Ms. Peter's numbers because the way it works, Judge, as a compliance manager, your bonus, your salary, your figures, depend on the numbers of your sales reps. And so if I can get rid of this sales rep, take her out of the pool, because I don't know if she can complete the job when she's pregnant, I can put her on FMLA. But it's not disputed that Peters was trying to tell her to take family leave, Acton. That's what I'm saying, Judge, not only trying, forcing her. But the logic that Peters had self-interest in numbers wouldn't have been advanced by that. Well, absolutely, Judge, because if she was out of the loop of sales reps, then those figures would not have counted against Ms. Peter's numbers. And so by essentially forcing her on FMLA, then she's out. You know what FMLA is for? Is that a bad thing to advise an employee to do that if you think she's having a hard time? Well, Judge, it's a bad thing if it's unpaid. And if Ms. Brown wants the choice to continue getting paid because she believes she can do the work when she's pregnant, then for her it's an issue of don't force me on something that I don't need or desire at this time. And when she did that, Ms. Brown rejected that. And part of our other accusation, Your Honors, is that once Ms. Brown told Ms. Peters, I don't want to take FMLA, the scrutiny increased. And with that, Judge, we believe we have a retaliation issue as well, that Ms. Brown's protective activity was refusing this FMLA, telling her HR department I don't want to take it, but there was retaliation upon retaliation once Ms. Brown refused that FMLA. Now, Judge, this is a constructive determination case. We realize that. And we realize that there is a heightened requirement to prove that in a constructive determination case that there was an element there with regards to the standards of humiliation, harassment, because we don't have demotion or termination or transferring Ms. Brown to another facility. What we do have are evidence in the record that she was humiliated. She was humiliated by that surprise audit meeting. What we do have in the record that we believe the trial court ignored in its narrow opinion, that medical documentation and medical testimony provided that Ms. Brown resigned or removed herself from the situation. The district court did not take that into consideration when it made its rendering and summary judgment. The district court opinion simply narrowed the issue to, was there termination? Was there demotion? Was there a transfer? And we put it to this body that that narrow interpretation of the pleadings or that narrow interpretation of the argument is not the law. The law is we also have to look at the totality of the circumstances. What would a reasonable person do in the situation that they were in? Is it a reasonable person with her personal characteristic being pregnant or just a reasonable person would feel compelled to resign given this level of scrutiny? Judge, we believe the case law is totality of the circumstances, and the case that I quoted, Donaldson v. CDB, Inc., goes into that. It's a reasonable person with everything embodying that reasonable person and looking at also the frequency, the nature of the harassment, looking at is it something that occurred over time or did it occur in a short period of time, and most importantly, Judge, I believe this court looked at what were the results of the conduct of the employer. Peter's never disciplined her. Never disciplined her. There's no expletives. There's no raised voice. There's no physical altercation. It's just close scrutiny of her numbers. It's not only close scrutiny, but it's how she did it. We're not bringing to the court what she did but how she did it, and I think that's the important factor here. The appellee will argue that this whole surprise audit, this whole— it wasn't even Ms. Peters that ordered it, but it was Ms. Peters that fabricated the reasons for it, which goes to the how, and the results of the how were that Ms. Brown was hospitalized, and because of that, we believe that she did receive an adverse employment action. Thank you, Mr. Riley. Thank you. Do you have some time left on rebuttal? And Mr. Hash? Committee of the Police Court. Counsel. A couple things I want to address off the bat because they were raised. First off, there is record evidence that Ms. Peters testified that she scrutinized all of her sales reps' numbers. They were low that January, lower than normal, and so she was concerned about everyone's numbers. So there was a comparison between this January and the prior January? Actually, Judge Prado, the plaintiff testified, Ms. Brown testified, that her numbers were off from normal January because she was experiencing some anxiety. She was missing some days. So her numbers were lower than normal even for January. The record evidence is very clear that when Ms. Brown told Ms. Peters about the pregnancy, Ms. Peters said, I haven't had a pregnant sales rep before. This is new to me, too. That's what she said. She did not say, hey, you're going to do your job. The record is clear on that. One of the challenges I have here is that we never received a ruling from the trial court as to the defendant's motion to strike a substantial amount of the summary judgment opposition filed by Ms. Brown. When we filed our motion for summary judgment, we relied upon the deposition of Ms. Brown, deposition to some extent of Ms. Peters, some declaration testimony of Ms. Peters, mostly to tighten it up, and the deposition testimony of Mary Garcia, who is the individual who was solely responsible for selecting Ms. Brown for audit. When we saw the response, it contained a 13-page declaration from Ms. Brown, which in our position inappropriately attempted to expand upon her deposition testimony and in some areas contradicted it. Now, I'm not going to go on and on about this, but just two important examples. I asked Ms. Brown very pointedly, before you resigned, did you complain to Human Resources? Did you go to Jeremy Holm, who was someone above Ms. Peters, about this alleged harassment that Ms. Peters was inflicting upon you? And the answer was no, very clearly. And yet, in her declaration, she says that on the day that she filed for her FMLA leave and her short-term disability, well, she told the short-term disability people everything about it. Well, the problem is short-term disability people are HR, and so that was a clear contradiction. The meetings between Ms. Brown and Ms. Peters changed substantially between her deposition testimony and the declaration. When I asked Ms. Brown to talk to me about the meetings, it was focused on my numbers. You need to get your numbers up. You could lose your sales assistant, which they all knew anyway. No words about her pregnancy. And then when you look at the declaration, she didn't remember how many meetings there were. She couldn't recall specifically really what was said in the meetings. She just said there were several meetings. In the declaration, five or six meetings, in great detail, contradicting or substantially trying to add to her deposition testimony. With that in mind, I do believe that even if the district court did consider that evidence, and I can't tell from looking at the opinion whether it did or did not. It did mention the affidavits of the two other individuals that were not mentioned in the court's ruling. Is that correct? Declarations? Yeah. Weren't there Ms. Bloomfield's and Ms. Moore's statements weren't included in the district court's ruling? They were not. They were not mentioned. The tenor of the opinion makes it look like the court disregarded it, but I have no definitive ruling one way or another. Even if that evidence was considered, I still believe that the district court was appropriate in dismissing the case, and I believe this court would be appropriate in doing the same. If you look at it now, you have four claims, two pregnancy-based, basically a hostile work environment claim, and then the constructive discharge. Then you have the retaliation claim, and then an FMLA interference. I will urge the court to take a look at the amended complaint by the plaintiff. It does appear to me that they abandoned any FMLA retaliation claim, and it looked like it was a prescriptive complaint that she was denied further FMLA leave. The majority of their argument today was the constructive discharge. And that's really the gravamen of the whole thing, Judge, because if you look at the underlying tenor of the opinion dismissing the case, it was that there wasn't a constructive discharge, there wasn't enough of a hostile work environment, and since the hostile work environment standard is lower than the constructive discharge, you can't get hostile work environment, then everything else goes away from the Brown v. Kennedy case. If you say, if you look at why we argue there's no hostile work environment, I think it's pretty clear. If you look at the case law from Morgan and Harris that we all know well, the burden is upon the plaintiff to show that we have this severe, pervasive harassment. We look at the frequency, we look at the severity, we look at the totality of the circumstances, and it is both an objective and subjective standard. And if you look at the cases where the Fifth Circuit has found no hostile work environment, and there are many cases that I know the Court is familiar with, look at the Shepard case. I'm not going to go into the details because they're rather salacious, and I think everyone knows them pretty well, but some very egregious sexual comments made by a supervisor. In that case, the Fifth Circuit said that even in that egregious case, no hostile work environment, and noted that the conduct had to basically destroy your opportunity to succeed. That was the language. The Hockman v. Westwood communication case, six instances of pretty egregious sex harassment, three of them physical, where he was touching the plaintiff. Again, no hostile work environment. The case he cited just today, Johnson v. CBD? If you read that case, I believe that it was much more egregious, and it lasted over a much longer period of time than in this case. The Ramsey case, where you had some pretty ugly racial badgering and some racial slurs. Again, no hostile work environment. And when you look at what you have here, and this is where the facts become important, there are basically three things that they complain of. The meetings with Peters, the Peters suggestion of FMLA, and then this ambush audit that we keep hearing about. Depending on which version of Ms. Brown's story you choose to look at, whether it's the declaration or the deposition testimony, let's look at the meetings. Possibly weekly, that's what the declaration seems to say. Talking about you need to get your numbers up, which is what I think managers of salespeople tell them when they're managing them. You could lose your sales rep because that was an important issue. They looked at them quarterly, and if they dropped below the numbers, they could end up actually having to pay for part of their sales rep's salary. Not too many people had these sales reps, and Ms. Brown had one because she was one of the top salespeople. No mentions of pregnancy during these meetings from the deposition testimony. It was solely about numbers, and that came through two or three times in the deposition. How soon does the record reflect that the first meeting where her numbers were criticized, how soon after her meeting saying, I'm pregnant, was that? Does the record indicate that? Judge, I can't tell from the deposition testimony because she could not remember exactly how long it was. I would venture to say it was a week from the declaration. I believe she said the meetings were weekly. The district court had a hard time seeing this as harassment, and I can see why, because I think most people would call this management, not harassment. The next one is suggesting the FMLA, and I would pose to the court what is a manager to do, because if you look at the context in which this occurred, Ms. Brown had just come in and told Ms. Peters that she had just missed some work because she had to go to the emergency room in fear of a miscarriage, and it was at this point, and it was in late January, that Ms. Peters suggested maybe you should consider taking FMLA, or even you should take FMLA. If that is harsh conduct, I'd hate to see what really harsh conduct is, because I would think harsh conduct would be, I don't care, get back to work and sell, suggesting, as Judge Higginson, you pointed out, that she go off on FMLA leave would not be helpful to someone who is relying on her numbers. She went ahead and took it, but there was a... Not at that time. Not at that time, but later on, a few weeks later, she took it, but she had a doctor that suggested that she do it? Yes, Judge Prado, she started it on March 1, so you had about a month later, give or take. And keep in mind what happened in between here. We have the audit that I'll talk about in a minute, but she worked up until February 18, at which time she went on a 10-day African vacation. She went to Johannesburg or Cape Town, something like that, was away from the workplace for, you know, pushing two weeks, comes back, calls in sick a couple of days, applies for FMLA, short-term disability, gets it immediately, and never comes back to work again. And it's important to note, it's not like Lynn Peters is hovering over her constantly, certainly not in Johannesburg and certainly not when she was staying at home. So I would submit that suggesting FMLA leave, and there is evidence that Ms. Peters sent an email to Human Resources to say, give her the information on FMLA if she wants it. There's an email exchange in the record where Ms. Brown in late January says, I don't need it right now, don't want it. Okay, fine, no problem. And then we go to this ambush audit, and I want to emphasize there is not one shred of evidence because it didn't happen, that Ms. Peters had anything to do with selecting Ms. Brown for this audit, nothing. This was a new audit system. This was Ms. Garcia's first audit. There were two people chosen. She chose a male and a female, and chose them because of their high numbers. Pulls auto and home policies and checks certain underwriting features to see if we're looking into facts carefully enough. Now, it's important to note this. This is not the first time Ms. Brown has been called in and questioned about a policy because in 2010, before she was ever pregnant, she was called in about a life insurance policy and she had sold to a young person who she had never met, never talked to. It turns out that person was in a gang, ended up getting killed, and there was some question about, well, did you do some due diligence here before you sold this? She wasn't disciplined. She was offered additional training, but she'd been questioned before. This audit, on the other hand, Ms. Peters had nothing to do with that. I'm just curious, does that have nothing to do with gang members' insurance? It's higher, more expensive? I suspect there's a higher premium, but I don't know that for sure. Ms. Peters has nothing to do with this audit. As a matter of fact, I didn't even know it was going on at first. Gets a call, Ms. Peters gets a call, not from the auditor, Ms. Garcia, but from Ms. Peters' superior who says, okay, I need you to go and follow up on some of this information to see if it's correct. For example, there are several people whose commuting distance in their auto policies was listed as one mile. Everybody seemed to have a new roof. I'm not going to tell the court that Ms. Peters found everything, something wrong with every policy by Ms. Brown because that is not the case. There were issues with some of them. Hence, calling her in to a meeting, and I think the record is not real clear what Ms. Peters told her. Ms. Brown is saying, come to a claims meeting, which sounds relatively benign. Ms. Peters said, and it was sent in an instant message, please come to the conference room. We need to meet about several things. We can take Ms. Brown's version of it because I don't really think that there's anything inherently evil about not saying exactly what the meeting was going to be about. The reason is, and Ms. Garcia, I believe, testified in her depo, that they didn't want the agents calling their insureds ahead of time and saying, don't pick up the phone. This was not some torturous meeting. First off, it didn't last for 15 or 20 minutes because Ms. Brown got upset and ran out of there like a turpentine wildcat because she was upset that she was being questioned. When she walked out of the meeting, Mr. Hone, who is now Ms. Peters' supervisor, goes out and talks to her. She says, I'm upset. I don't know what to say here. He says, we can do this tomorrow. She comes back the next day, and they finish it up without incident. No problems. No disciplinary action of any kind was ever taken as a result of that meeting, ever. That was on the 15th, the second meeting on this audit, and then on the 18th. Ms. Garcia was not aware of Ms. Brown's pregnancy? Didn't know her, was not aware she was pregnant. It's in the record. And again, she audited a mail at the same time. The 18th is when, February 18th, is when Ms. Brown goes on her trip. It had been long planned, I think, since November, I believe she testified. Goes with her mother, stays gone 10 days, comes back, doesn't feel well for the first couple days that she's back, calls in sick, then applies for her short-term disability and FMLA leave through the Human Resources Department and gets it and goes. That leave is approved through April 29th, I believe the record evidence shows, and yet on April 15th, she resides. If you consider all that, then it's not surprising to me that the district court found that there was insufficient evidence for either a hostile work environment and certainly not for a constructive discharge. Now, the constructive discharge standard is objective only, and when you look at some of the laws cited by the court relating to constructive discharge, it makes perfectly good sense why this wasn't found to be one. You look at the Haley case, Haley versus Reliance Compressor out of the Fifth Circuit. There you had someone in Human Resources and fabricated deficiencies in performance, setting overly strict performance plans, threats to fire her, micromanagement, excluding her from meetings, openly ridiculing her. When she was on an FMLA leave, one of her co-workers told her they're wanting to fire you. None of that found sufficient. All of that in the totality was found to be inconsistent with an actual constructive discharge. It's a high standard, and it should be. So when you consider that, then I'm not surprised that the district court found that the case should be dismissed. The retaliation case is, I believe, easy to dismiss as well, and here's why. If you believe her deposition testimony, she never engaged in any protected activity in the first place. We know you have to have protected activity, an adverse employment action, and a causal connection between the first two. She testified she didn't tell anybody about this harassment by Ms. Peters, so there's no protected activity. If you take her version of it from her declaration as true, then consider this. She says she told whoever was in the short-term disability function about Ms. Peters' conduct, but that was on the day that she took her leave. She never came back. So how was she being mistreated? What kind of adverse employment action did she suffer after she left? And unless this court buys that it was a constructive discharge somehow triggered on April 15th, there isn't any adverse employment action, so she can't even make a prima facie case of retaliation, and the court appropriately considered that and dismissed it. And finally, on the FMLA, she got the FMLA exactly as she asked when she applied for it. They gave her the full time requested by her doctor. There was no prescriptive violation whatsoever. In fact, I think the record evidence was clear. If she provided another doctor's note, she could extend it up to the full 12 weeks. She chose to resign before her initial leave period was even exhausted. How could there be any prescriptive violation of the FMLA? I don't know, unless this court again finds that this truly was a constructive discharge and then thus she didn't get to take the rest of her FMLA leave had she applied for it down the road. That is really all I needed to address. If there are any questions from the court. Thank you, sir. Thank you, sir. Mr. Wiley, you have another five minutes on rebuttal. Thank you, Judge. I appreciate the court's time today. Your Honor, I concentrate on the constructive discharge because basically it's like a set of dominoes. If you look at the constructive discharge and the court's narrow interpretation of what is humiliating and harassing in order to get to that third prong, in order to not establish the constructive discharge, everything else tumbles. Everything else falls away. As my esteemed colleague suggested, the FMLA goes away because essentially if she does have constructive discharge, she is not receiving the FMLA when she has her child, and that was part of our argument. If there is constructive discharge, then that heightened requirement for a pervasive environment is there for the harassment claim. So it all coincides and it goes back to that element of what is pervasive. And in looking at what is pervasive, we look at, once again, the evidence leading up to ultimately the surprise audit. Now, my colleague also suggested that Ms. Peters may have not been benign in addressing the audit, but she wasn't evil. Well, we agree that it wasn't something that was evil, but we don't believe that it was at the level of such venality that Ms. Brown was not affected by it and ultimately traumatized by it. This whole issue of Ms. Peters not requiring the audit herself, we think is a red herring. Once again, the issue is not what happened or who ordered it, but how it happened and what were the effects of it happening. The how is Ms. Peters told Ms. Brown, come to my office for a routine sales meeting, and ultimately that was fabricated. It was shock and awe and part of a process to get her to feel something. And in feeling something, she was ultimately traumatized, which led to hospitalization. That is the effect, and that's what the case law looks at when analogizing what is essentially pervasive. It's the effect. It's a cause and effect as part of the court's analysis. We have Ms. Peters' comments about the pregnancy, and we have this audit that you say was probably motivated for same reasons. Do you have something else in addition to that audit and the comments made by Ms. Peters? Were there other employees or employers, anybody there at work that were giving her a hard time? Well, no one there giving her a hard time other than Ms. Peters, nothing in the record to reflect that, Judge. However, what we also have is an issue of disparate treatment in that Ms. Peters, once again, was scrutinizing Ms. Brown, but was not scrutinizing the other sales reps in the same capacity. So alternatively, another issue that the court can look at is whether or not this disparate treatment also interplays with how Ms. Brown was effectively treated and how she ultimately decided to resign for her safety and the safety of her unborn child. Once again, the reason why I quoted Donaldson v. CDBD, my esteemed colleague quoted several cases which go into basically the longevity, the frequency of pervasiveness. That particular case pretty much provides the interplay between some of the cases that this court has decided upon, which looks at that pervasive issue, versus just looks at the frequency of what happened. Once again, Donaldson v. CBD really looks at the intensity of what happens and the effects of what happens to an employee who's subjected to humiliation. Thank you for your time, gentlemen. Thank you, Justice.